## Tetlow's Estate.

Argued January 20, 1936. Before KEPHART, C. J., MAXEY, DREW, LINN and BARNES, JJ.

*Stanley B. Rice,* with him *Maurice W. Sloan* and *Samuel H. High,* for appellants.

*A. Clarence Emery,* for appellee.

OPINION BY MR. JUSTICE MAXEY, March 23, 1936:

This is an action for the specific performance of a parol contract for the conveyance of real estate, where the person making such parol agreement died seised of such real estate and no sufficient provision for the performance of the contract had been made by the decedent, all of which proceedings are provided for in the Fiduciary's Act of June 7, 1917, P. L. 447, section 18 [e],* (20 PS, 615).

The decedent, Eliza Jarman Tetlow, died June 24, 1931. In 1924 and previous thereto she had been a patient in Battle Creek Sanitarium, in Michigan. The petitioner was then a physical director and "health specialist" in that institution. Mrs. Tetlow's health improved under his care and treatment.

It was testified that in the summer of 1924 at the sanitarium, in the presence of John G. Bastalich, the decedent and the petitioner had a conversation in which she asked him whether he had considered coming to her home in West Norriton Township, Montgomery County, Pennsylvania, to take care of her. Decedent had told the petitioner of a property which she had in West Norriton which he could use as a health sanitarium. Decedent asked him if he would give $12,000 for it after certain alterations were made, and he said he would.

Petitioner came to West Norriton, Pennsylvania, in May, 1925, and was installed in the property after it had been remodeled. It then consisted of a new building

---

* This is identical with the provision in section 16 of the Act of February 24, 1834, P. L. 73. A substantially similar provision is found in section 4 of the Act of April 28, 1899, P. L. 157.

equipped as a gymnasium, a house, where the petitioner and his mother resided, and another small house. From the year 1925 until June, 1931, the date of Mrs. Tetlow's death, petitioner was in almost daily attendance upon her, giving her exercises and treatments. She frequently expressed to others her feelings of gratitude toward the petitioner, Lodge, for his skill and efficiency in reducing her weight by more than one hundred pounds, improving her health and, as she apparently believed, prolonging her life. Lodge conducted a health center on the property in question and had many patrons.

On June 15, 1925, the decedent and petitioner entered into a lease of this property. The terms were $1,200 rent for the first year and $1,800 annually thereafter. This lease was terminable by either party on three months' notice at the end of any one year. This lease was terminated by a notice, on the part of the petitioner to the decedent, which was delivered to her in February, 1930. It was testified that when Mrs. Tetlow read it she said that the notice was entirely unnecessary as she never had regarded the terms of the lease as being in effect inasmuch as she and Lodge (the petitioner) had their distinct understanding about the property. It was explicitly testified by a witness that he was present when Lodge handed the notice of the lease's cancellation to Mrs. Tetlow and that the latter declared that "the lease terminated when we entered into the agreement whereby your salary should be on the purchase price of the property."

The court below found from the testimony that the agreement between the petitioner and the decedent at Battle Creek was that decedent was to remodel the property for the purpose of a gymnasium and the residence of petitioner, petitioner's salary was to be $4,000 per year, the same as he had had at Battle Creek, and that he was to purchase the property at the price of $12,000. Later, when Lodge had severed his connection with Battle Creek Sanitarium and had come to Pennsylva-

nia, decedent informed him that she would not let him have the property for $12,000 as its remodeling had cost her much more than that, and he would have to pay $30,000 for it. This modification of the original agreement was assented to by Lodge. Decedent further proposed that she would not pay him the $4,000 annually in cash, but she would apply this salary on the purchase price, and after he had worked for her 7½ years she would convey the property to him; and she further agreed that if she died in the meantime, she would provide in her will for the devise to him of the property.

The court below said: "These were clearly the terms of the contract as finally arrived at and which were in effect at the time of her death on June 24, 1931. It was so acknowledged to be the contract by decedent time and time again, and even voluntarily and positively asserted to be the terms of the contract, to various witnesses, by decedent."

The court further found: "It is not denied that the property which was the subject of this conversation was the identical property which is the subject of this proceeding and there can be no doubt as to this fact." There was proof offered that there had been four successive wills drafted for the decedent, in the seventh item of each one of which she had devised the property in question to the petitioner. The original of each of these wills was offered in evidence. As to these the court said: "The important fact as to all four of these wills was that, in obvious compliance with her acknowledged agreement, she had in item seven of each devised the property to the petitioner for his protection in case of her death prior to the consummation of the agreement and the conveyance of the property to him in her lifetime." As her death occurred before the end of the seven and one-half years and as she revoked apparently the only will which she had finally executed, "she," quoting the court below, "created a breach of her contract with the petitioner."

The cancellation of the wills in which she had devised this property to petitioner has no significance adverse to his claim. There was evidence showing that the cancellation of the wills was due to some financial difficulties and to her health. There was evidence from which the court below drew the inference expressed in the following excerpt from the opinion filed: "She, no doubt, after the cancellation of the will in which she had devised the property to petitioner, would have made another will had it not been for the disturbance of her financial difficulties and her health which was beginning to fail at that time owing to a mortal disease which was beginning to attack her." Regardless of what Mrs. Tetlow might have done had she lived longer, in respect to a devise of this property, the cancellation of the wills does not disturb the evidentiary value of the testamentary drafts offered in evidence as proof of the contract pleaded.

The court below also found from the evidence that the identity and quantity of the land was clearly established, together with its limits, by the witness Emily Heiser, who had been the companion of decedent for more than twenty-five years and who was familiar with the property. Miss Heiser testified that "one side is bounded and determined by Schuylkill Avenue, a second side is determined by Butler Avenue, a third side is determined at the back (or the side toward Norristown) by an orchard and a fence, and on the fourth and last side, or the side toward Port Indian, by a ditch and an old drive clearly making the limitations and boundaries. Shrubbery and the limits of the mowed lawn coincide with these limits and boundaries. The buildings erected thereon were the gymnasium and the building or home."

The court below decreed the specific performance of the contract pleaded in the bill, providing, however, that all taxes accruing upon the property in question since the death of the decedent on June 24, 1931, shall be paid by the petitioner.

As to the proof required to establish a parol contract for the sale of real estate, this court in *Bassler v. Niesly et al.,* 2 S. & R. 352, approved the instruction that the court below in that case gave the jury, stating (in an opinion by Mr. Chief Justice TILGHMAN) : "The court charged, 'that the contract might be proved by circumstances.' The court said, that there was no need of *express* proof; but at the same time, the jury were told to find for the defendant, unless the contract were proved *clearly* and *to their entire satisfaction.* What more could be necessary? If conviction is brought home to the mind, it is sufficient; it is immaterial, whether the proof be by the oath of a person who was present and heard the contract, or by evidence of a variety of circumstances, such as confessions of the party, payment of purchase money, delivery of possession, etc., which, taken altogether, leave the mind in no doubt as to the existence of the contract."

In the instant case the testimony leaves one in no doubt as to the existence of the oral contract pleaded and no doubt as to the identity of the property which was its subject. Furthermore, possession of this property was clearly proved. Included in the proof of the identity of the property is the testimony of W. A. Wilson, Editor of the Norristown Times-Herald. In discussing with the decedent the Times-Herald project of a boulevard from Norristown to Valley Forge, Mrs. Tetlow remarked that if the boulevard went through the particular property Mr. Wilson and she were then standing on, "he [Wilson] would have to deal with Mr. Lodge." This witness further testified: "She continued by saying that the reason for that would be that by some agreement or arrangement the property was to become his [Lodge's] in a few years, and in the event of her death that she had intended to will it to him because of services rendered to her." The court then asked this witness: "What property were you standing on at the time?" He answered: "On the property upon which

there is a gymnasium and a house—on the east side of Schuylkill Avenue below Main Street, toward the Schuylkill River." This and other evidence of a corroborative character excludes all doubt that the property demanded in the bill is the property which was the subject-matter of the contract between the parties.

Appellants stress the point that the petitioner rendered the decedent only six years' services because of her death at the end of that period, and that the services at the rate of $4,000 a year for such period would not amount to $30,000, the alleged purchase price of the property. But there is evidence in the case warranting the finding that the contract between decedent and petitioner was not limited merely to these terms. The contract appears to be that if the petitioner would take care of the decedent professionally, she would allow him compensation at the rate of $4,000 a year, and that this salary would be permitted to accumulate in her hands and applied to the purchase price of the property and that if Mrs. Tetlow died before the expiration of seven and a half years (which would be the term of the services required to earn $30,000), the petitioner would be protected by a devise in Mrs. Tetlow's will.

There was read into the record of this case the depositions of Leo M. O'Melia of Fonda, New York, to the effect that in the summer of 1925 he was present with Lodge and the latter's mother and Mrs. Tetlow at Lodge's home at Jeffersonville, Pa.; that Mrs. Tetlow reported how much her health had improved under Lodge's treatments; and that Mrs. Tetlow stated that "she had agreed to pay Lodge $4,000 per year and if he, Lodge, would agree to allow this $4,000 a year to accumulate on the purchase price, of the property, she would deed him the property, free and clear at the termination of 7½ years." He further deposed: "Lodge asked Mrs. Tetlow in what way he would be protected in case her death occurred before the expiration of the 7½ years and Mrs. Tetlow replied that she would immediately

make a will leaving the property to Lodge in the event of her death."

Another witness, John G. Bastalich, testified by depositions read into the record that Mrs. Tetlow had stated that she had made a provision in her will to protect Lodge in case she died before the agreement terminated. This witness testified that "Mrs. Tetlow evidently thought a great deal of Mr. Lodge and never failed to remark that he had saved her life with his training and she hoped that she would be able to repay him for his kindness, reiterating again that she had left the house and gymnasium to Mr. Lodge in her will."

The court below accepted all the foregoing testimony and made findings (though not *formal* "findings of fact") consistent therewith.

Many checks were offered in evidence in this case showing payments of money from the decedent to the petitioner, but it was nowhere shown that these checks were in payment of his salary. An explanation of these checks, based largely on inference, is that they were given in relation to Mrs. Tetlow's business transactions, for it was shown that Lodge frequently acted as Mrs. Tetlow's business agent. To negative any inference that these checks were salary checks, the petitioner called as a witness Miss Heiser, who produced a book that was kept by the deceased showing the record of the employees and their payment of wages. The witness said that she [the witness] "paid the wages for Mrs. Tetlow and they all signed a wage book." She was asked: "Did Mr. Lodge's name appear in that book as one of the employees who was paid wages from time to time, and did he sign it?" She answered, "No, sir, he never signed it. He never was paid—never signed it."

The court below found that the decedent "never paid him [petitioner] a cent the whole time he occupied the property and gave her all the treatments and other personal service that the evidence shows he did." The court further said: "It is plain that he [petitioner] not only

performed the services that the contract called for, but he did infinitely more, and practically became her confidential business advisor and business agent and helped her in the management of all her personal affairs and her large estate on which she lived." All these findings were based on the testimony of witnesses whose credibility was, of course, for the court.

In *Haslet v. Haslet,* 6 Watts 464, this court characterized as "a correct, exposition of the law" the opinion of the court below, in which appears the following: "It is too well settled to be now disputed, that where money has been paid, and possession given, in pursuance of a parol contract for the sale of land, equity will enforce the specific execution of the contract, on the ground that, to suffer a man who has received his money to take both money and land, by pleading the statute of frauds, would be making the statute itself the instrument of fraud, which it was made to prevent." In that case the court below said further: "It would be contrary to all correct principle, not to require of him the most full and satisfactory evidence of the facts alleged as entitling him to the inference of the chancellor." See *Baxter v. Doane,* 208 Pa. 585, 57 A. 1062, and *Jamison v. Dimock,* 95 Pa. 52.

In *Hart v. Carroll,* 85 Pa. 508, this court said, speaking through Mr. Justice WOODWARD: "In order to take a parol contract for the sale of lands out of the operation of the statute of frauds, its terms must be shown by full, complete, satisfactory and indubitable proof. The evidence must define the boundaries and indicate the quantity of the land. It must fix the amount of the consideration. It must establish the fact that possession was taken in pursuance of the contract, and at or immediately after the time it was made, the fact that the change of possession was notorious, and the fact that it has been exclusive, continuous and maintained. And it must show performance or part performance by the vendee which could not be compensated in damages, and

such as would make rescission inequitable and unjust. These rules have been settled by a long series of authorities, including *Goucher v. Martin,* 9 Watts 106." (And other cases cited.)

The court below found that the evidence produced in behalf of petitioner measured up to the high standard of proof made mandatory by this court in a long line of cases. An examination of the record convinces us that there is no warrant for setting aside these findings or reversing the decree based thereon.

The decree is affirmed at appellants' costs.