533 A.2d 1370

**Edward N. KURLAND, Esq., Executor of the Estate of Allan Cohen, Deceased, and Bernadine Cohen, Appellees,**

**v.**

**Leonard STOLKER, Individually and trading as Lombard Mews Co., a Partnership, and Philicent Corporation, Appellants.**

Supreme Court of Pennsylvania.

Argued April 9, 1987.

Decided Dec. 2, 1987.

---

**16.** According to the record, Notice of Judgment was mailed from the prothonotary's office on April 25, 1983.

589

Dennis H. Eisman, Philadelphia, for appellants.

F. Emmett Fitzpatrick, Philadelphia, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.*

This is the appeal of Leonard Stolker, individually and trading as Lombard Mews Co., a Partnership, and Philicent Corporation (Appellants) from the Per Curiam Order and Memorandum Opinion of the Superior Court, 344 Pa.Super. 632, 495 A.2d 619, affirming a final decree entered by the Court of Common Pleas of Philadelphia County, directing Appellants to convey real estate to Edward N. Kurland, Esq., Executor of the Estate of Allen Cohen, Deceased, and Bernadine Cohen (Appellees), and awarding Appellees damages in the amount of $33,350.00. For the following reasons, we reverse the order of the Superior Court and dismiss Appellees' complaint.

* Reassigned to this writer on October 7, 1987.

The interesting factual background to this matter can be briefly summarized as follows:

Sometime prior to 1970, Allen Cohen, professing to be the right-hand man of Jimmy Hoffa, met Leonard Stolker, a building contractor, through a mutual acquaintance. Cohen understood that Stolker wanted to meet someone who could help smooth out the feathers of union officials which Stolker had ruffled because he was hiring non-union workers on his construction jobs. Stolker, on the other hand, claims that he wanted to hire a security guard/night watchman and/or occasional bill collector, and in return for performing these services, this person would be furnished a unit in the rental properties he was building as his residence. The mutual acquaintance suggested Cohen to Stolker and arranged a meeting between the two, after which some sort of understanding was reached which is the basis of the instant action.

The record "clearly"[1] shows that from 1970 to 1973 Cohen resided in Unit 21 of the Lombard Mews, owned by Stolker; that from 1973 to 1976 Cohen lived in Unit 26; and from 1976 onwards that he resided in Unit 1 of the same development until sometime in July of 1978, when Cohen was notified by Stolker that he was being evicted.

Pursuant to that notification, this equity action was instituted by Cohen seeking specific performance of an alleged oral contract for the purchase of realty. Cohen died prior to trial, and his deposition, together with the live testimony of Mrs. Cohen and Mr. and Mrs. Stolker, was received by the Chancellor, along with a few others, in an attempt to establish whether an enforceable oral contract for the sale of land existed between Cohen and Stolker. The Chancellor, the former Judge of the Court of Common Pleas of Philadelphia, Bernard Snyder, ruled in favor of Mrs. Cohen and directed that Stolker convey Unit 1 to her and pay her an additional $33,350.00 in damages and entered a final decree to that effect on May 9, 1984. Stolker took an appeal from that decree to the Superior Court which, as

1. The term is used somewhat loosely.

previously noted, affirmed the Chancellor by per curiam order.

Stolker then filed a petition for allowance of appeal to us arguing: 1) that the Chancellor's adjudication flies directly in the face of the statute of frauds and perjuries;[2] and 2) that Mrs. Stolker's testimony at trial, being in opposition to that of Mr. Stolker's, was prohibited by virtue of our spousal immunity statute, which makes a wife incompetent to testify against her husband in any civil matter.[3]

Since the maintenance of the statute of frauds, as a rule of property, is a matter of great public concern (see, *Rader v. Keiper*, 285 Pa. 579, 132 A. 824 (1926); *McKowen v. McDonald*, 43 Pa. 441 at 444 (1862)), we granted allocatur and now reverse.

Much has been written in our case law about the celebrated statute of frauds. The statute represents one of the most formidable and salutary safeguards of property in the entire lexicon of law. *Klingensmith v. Klingensmith*, 375 Pa. 178, 100 A.2d 76 (1953).

The statute is simple and intelligible.

Every mind is capable of understanding that contracts about land, if more is meant than a three years lease,

2. Act of March 21, 1772, 1 Sm.L. 389, § 1, 33 P.S. § 1, which provides, in pertinent part:

§ 1. **Parol leases, etc.; estates in lands not to be assigned, etc., except by writing**

From and after April 10, 1772, all leases, estates, interests of freehold or term of years, or any uncertain interest of, in, or out of any messuages, manors, lands, tenements or hereditaments, made or created by livery and seisin only, or by parol, and not put in writing, and signed by the parties so making or creating the same, or their agents, thereunto lawfully authorized by writing, shall have the force and effect of leases or estates at will only, and shall not, either in law or equity, be deemed or taken to have any other or greater force or effect, any consideration for making any such parol leases or estates, or any former law or usage to the contrary notwithstanding; ...

3. Act of July 9, 1976, P.S. 586, No. 142, Sec. 2, effective December 4, 1978, 42 Pa.C.S. § 5924(a) provides:

§ 5924. **Spouses as witnesses against each other**

(a) **General rule.**—In a civil matter neither husband nor wife shall be competent or permitted to testify against each other.

must be in writing ... And what rule is more reasonable? Land is the most important and valuable kind of property. Or if it be not, there is no other stake for which man will play so desperately. In men and nations there is an insatiable appetite for lands, for the defense or acquisitions of which money and even blood sometimes are poured out like water. The evidence of land-title ought to be as sure as human ingenuity can make it. But if left in parol, nothing is more uncertain, whilst the temptations to perjury are proportioned to the magnitude of the interest. *Moore v. Small*, 19 Pa. 461 (1852).

The object of the statute is to prevent the assertion of verbal understandings in the creation of interests or estates in land and to obviate the opportunity for fraud and perjury. It is not a mere rule of evidence, but a declaration of public policy. In the absence of equities sufficient of themselves to take the case out of the statute, it operates as a limitation upon judicial authority to afford a remedy unless renounced or waived by the party entitled to claim its protection. *Haskell v. Heathcote*, 363 Pa. 184, 69 A.2d 71 (1949); *Schuster v. Pa. Turnpike Commission*, 395 Pa. 441, 149 A.2d 447 (1959).

Our case law is very explicit as to the requirements which must be met to take an oral contract for real estate out of the statute. The terms of the contract must be shown by full, complete, and satisfactory proof. The evidence must define the boundaries and indicate the quantity of the land. It must fix the amount of the consideration. It must establish the fact that possession was taken in pursuance of the contract, and, at or immediately after the time it was made, the fact that the change of possession was notorious, and the fact that it has been exclusive, continuous and maintained. And it must show performance or part performance by the vendee which could not be compensated in damages, and such as would make rescission inequitable and unjust. *Beers v. Pusey*, 389 Pa. 117, 132 A.2d 346 (1957); *Klingensmith v. Klingensmith*, 375 Pa. 178, 100 A.2d 76 (1953); *Arndt v. Matz*, 365 Pa. 41,

73 A.2d 392 (1950); *Moyer v. Moyer*, 356 Pa. 184, 51 A.2d 708 (1947); *Brotman v. Brotman*, 353 Pa. 570, 46 A.2d 175 (1946); *Warburton v. Warburton*, 342 Pa. 401, 21 A.2d 21 (1941); *Kirk v. Ford*, 330 Pa. 579, 200 A. 26 (1938); *Tetlow's Estate*, 321 Pa. 305, 184 A. 129 (1936); *Marshall v. MacGregor*, 314 Pa. 454, 171 A. 598 (1934); *Rader v. Keiper*, 285 Pa. 579, 132 A. 824 (1926); *Greenwich Coal and Coke Co. v. Learn*, 234 Pa. 180, 83 A. 74 (1912); *Shaffer's Estate*, 205 Pa. 145, 54 A. 711 (1903); *Derr v. Ackerman*, 182 Pa. 591, 38 A. 475 (1897); *Graft v. Loucks*, 138 Pa. 453, 21 A. 203 (1891); *Anderson v. Brinser*, 129 Pa. 376, 11 A. 809 (1888); *Reno v. Moss*, 120 Pa. 49, 13 A. 716 (1888); *Appeal of Barbey*, 119 Pa. 413, 13 A. 451 (1888); *Hart v. Carroll*, 85 Pa. 508 (1887).

■ The party that would ask a chancellor to decree specific performance in his favor has the burden of proof thrown on him. He knows, or is presumed to know, that the law requires, as evidence of the title to land, that the contract must be made in writing. *Lord's Appeal*, 105 Pa. 451 at 457 (1884).

He has acted with great negligence and folly who has paid his money without taking the proper and legal evidence. When, therefore, he requests a court to interfere for him, and save him from the consequences of his own disregard of the law, when he asks the court to decree in his favor, in the face of the letter of the law, he should be held rigidly to full, complete, satisfactory and indubitable proof. *Hart*, 85 Pa. at 511.

These are stringent, but salutary and beneficial rules in the maintenance of which the public welfare is involved.

■ The "indubitable proof" a claimant is required to proffer is evidence that should not only be found credible, but of such weight and directness as to make out the facts alleged *beyond a doubt*. *Hart*. As the alleged contract is not between parent and child, it may be proven by the acts and declarations of the parties, either together or separately. *Allison v. Burns*, 107 Pa. 50, 51 (1884). The acts and declarations relied upon, must not, however, be of an equiv-

ocal character; they must have such clearness and direct-ness as will leave no doubt as to their meaning and purpose. *Allison.*

Turning to the case *sub judice,* the only party in a position to establish the existence of all the elements to this oral contract was Cohen himself. His deposition testimony alleges that in return for paying Stolker $37,500.00, acting as a mediator with certain union officials and collecting delinquent rental accounts, Cohen was to purchase a residential unit in Lombard Mews.

Cohen admitted that his understanding initially involved Unit 21 (from 1970 to 1973), then Unit 26 (from 1973 to 1976), and finally Unit 1 (from 1976 onwards), and that over the years in question he moved into these three different units. Cohen attempted to demonstrate that he paid the purchase price by alleging that he paid $125.00 weekly to Stolker, that Stolker had him on his payroll at $100.00 per week for four years, and that Jimmy Hoffa gave Cohen $10,000.00 which, in turn, was given to Stolker, and that all these payments were to be credited to the $37,500.00 purchase price. Receipts were not produced for any of these cash payments. Cohen also asserted that he spent over $21,000.00 on the three units in maintenance and improvements. Similarly, no receipts were produced for any of these expenditures.

Stolker, not surprisingly, denied the existence of an oral land contract and asserted that Cohen was living in various units as a tenant and working as a security guard and maintenance man. Stolker denied receiving $125.00 per week or $10,000.00 from Jimmy Hoffa, but acknowledged that he was paying Cohen $100.00 a week for his security guard/maintenance man services and that he was crediting these payments as rent. Stolker had receipts in the form of W–2 forms for the years 1973 to 1976, inclusive, showing that payments had been made to Cohen and also introduced into evidence his rental log for the years in question which listed Cohen as a tenant.

Stolker also established that for all the years in question he paid the real estate taxes and water and sewage charges on the properties.

Mrs. Cohen, in an attempt to corroborate her husband's claim, acknowledged that they lived in three different units over the years in question and that her husband had told her that he had paid for the house in full. She did not know how he had paid for the house or that Cohen had been paying $125.00 per week to Stolker on account of the purchase price.

Mrs. Cohen also testified that she was present when Jimmy Hoffa gave her husband $10,000.00 to give to Stolker for the purchase of the house, but Mr. Cohen did not testify that his wife was present at this transaction. Mrs. Cohen also testified that her husband had installed into the various units rugs, cabinets, refrigerators, stoves, washers and dryers, lighting fixtures, a fireplace, bath, heating and air conditioning, as well as doing exterior work, but acknowledged that they had no receipts for these claims as they were paid for in cash.

Finally, Mrs. Cohen admitted that, inspite of her alleged understandings about her husband's land contract, she issued four checks to Stolker for rent and marked them as such, and that she negotiated with Stolker to purchase the property for $65,000.00 and executed a sales agreement to that effect.

Another colorful character known as "Broadway Eddie" appeared in support of Cohen's claim and testified in favor of the existence of a parol contract for land, by claiming to have been present when Jimmy Hoffa gave Cohen $10,000.00 for the house. Eddie did not know the location of the house, its purchase price, or any other details of the contract.

To round out the cast of characters before the Chancellor, Mrs. Stolker was permitted to testify that she was present when the contract was formed and that by its terms Cohen was to be given a house for his services. Mrs.

Stolker did not remember a purchase price, a unit number, or anything about $125.00 per week, or the $100.00 per week that her husband was paying Cohen, but she did remember the $10,000.00 from Jimmy Hoffa. Mrs. Stolker's testimony was received, inspite of 42 Pa.C.S. § 5924, which makes Mrs. Stolker *incompetent* to testify against her husband in a civil matter. We should add at this point that Mrs. Stolker's testimony was obviously improperly received into evidence and should not have been considered by the Chancellor.[4]

This was the posture of the parties and when declarations such as these have been made which stand opposed as the poles of a needle, how can a contract be said to have been proven? Since Cohen attempted to avoid the statute of frauds and perjuries, the burden of proof was on him. All the *prima facie* presumptions were in favor of Stolker. We ask ourselves, did Cohen overcome them by such "indubitable proof," proof which is beyond a doubt, as is required to set aside the statute?

In the first place, Cohen relied only on his own recollection and unsubstantiated allegations to establish a contract that Stolker denied making. The contract cannot be inferred only from the declarations of one of the parties. To hold otherwise is tantamount to setting aside the statute of frauds. *Haskell v. Heathcote*, 363 Pa. 184, 69 A.2d 71 (1949); *Wright v. Nulton*, 219 Pa. 253, 68 A. 707 (1908). Mrs. Cohen was not present when the contract was entered into and could only repeat what her husband had said to her. She had no independent knowledge of the contract and could infer none from the actions of her husband or Stolker. Her own conduct, in paying rental checks to Stolker and negotiating with Stolker to purchase the property in her own right, demonstrates that she herself was equivocal whether her husband had, in fact, purchased the property.

4. This is so even where, as here, the Stolkers had been divorced at the time of trial. But the record clearly showed that their divorce decree was not final at the time since they both had appealed the decree to the Superior Court and it was pending at the time of trial in this case.

Such evidence is not the full, complete, satisfactory and indubitable proof required by our law.

■ In the next place, the evidence of possession is insufficient to prove open, notorious, exclusive and continuous possession in furtherance of the contract. As the matter stands, the conflicting testimony respecting possession is consistent only with the lease claimed by Stolker and not with the purchase averred by Cohen. Why else would Cohen move out of "his" house three times and permit Stolker to pay the taxes and water and sewage for eight years if Cohen was the actual owner? *Exclusive* possession taken and kept up in pursuance of the contract is an indispensable ingredient in every case and such is not present here. *Wright v. Nulton,* 219 Pa. 253, 68 A. 707 (1908); *Lord's Appeal,* 105 Pa. 451 (1884); *Postlethwait v. Frease,* 31 Pa. 472 (1858).

Finally, the improvements were not such as to permit a court to decree specific performance. Possession must be accompanied by such improvements and arrangements as will not reasonably admit of compensation in damages so as to take a parol contract out of the statute of frauds. *Dougan v. Bloucher,* 24 Pa. 28 (1856); *Moore v. Small,* 19 Pa. 461 (1852).

Cohen claimed that he made substantial repairs and improvements to the units and to this we respond as we did in *Rader v. Keiper,* 285 Pa. 579, 132 A. 824 (1926), "Repairing and improving a dwelling house or outbuildings are such improvements as any tenant for a term of years might make," but are not of a character to take a cause out of the statute. *Moyer v. Moyer,* 356 Pa. 184, 51 A.2d 708 (1947). Additionally, the proof for such improvements came only from Cohen's mouth and it is incredulous to us that the Chancellor found credible Cohen's claim from this flimsy record. Where were the receipts to corroborate that such substantial sums had been expended by Cohen? There were none. Where were the artisans who worked so diligently to improve these homes over the years to corroborate Cohen's claim? They were not presented. Yet, on

the deposition testimony of Cohen, all these allegations were accepted as fact. Mrs. Cohen had no independent proof of the repairs either, or receipts for the work done. Yet, she apparently convinced a chancellor that such was the case. Again, we cannot permit such a finding to stand, based as it is only on the oral declarations of one of the parties, lest we set aside the statute of frauds and permit the statute to be an instrument of fraud.

In short, Cohen's demand for specific performance was bold. To execute a parol contract against an express statute is the exercise of a large power; to execute it without competent proof of its existence, without the established test of its past execution, is a wild stretch of authority, which no court of law or equity ought to make. Yet, that appears to be exactly what occurred here.

If titles to land are to be proved in the manner that this record presents and "if chancellors are to act on doubtful parol proof, on strained and fanciful inferences, or vague surmises, they would annul the wholesome provisions of the statute in search of a visionary equity and introduce into the community the very evils which the legislature intended to remedy." *Lord's Appeal*, 105 Pa. 451 (1884).

This, then, is not a case for specific performance. As the evidence stands, it neither establishes a right for execution of the oral agreement or compensation for damages. The evidence is simply too weak. Judges have been borne away by sympathy for parties in the past and have strayed from the letter of the law, and such may have been the case here, but we cannot permit such malicious accommodations to stand unless we wish to unleash copious fountains of litigation and throw land-titles into total confusion, and the statute of frauds out the window. This we will not do.

Accordingly, the Order of the Superior Court is reversed and Appellee's Complaint is dismissed.

HUTCHINSON, Former Justice, did not participate in the decision of this case.

LARSEN and ZAPPALA, JJ., concur in the result.