**FIRETREE, LTD., Petitioner**

**v.**

**DEPARTMENT OF GENERAL SERVICES, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 19, 2008.

Decided July 30, 2009.

Daniel F. Schranghamer, Williamsport, for appellant.

David L. Narkiewicz, Asst. Chief Counsel and Harry R. Walter, III, Asst. Counsel, Harrisburg, for appellee.

BEFORE: PELLEGRINI, Judge, and LEAVITT, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge LEAVITT.

Firetree, Ltd. petitions for review of an adjudication of the Board of Claims (Board) granting summary judgment to the Department of General Services (Department) on Firetree's breach of contract claim. Firetree asserts that the Department breached two oral settlement agreements by which the Department agreed to convey real property to Firetree and its affiliate, New Foundations, thereby causing Firetree to suffer damages in the form of lost rental income and lost profits. Concluding, *inter alia,* that the Statute of Frauds prohibits enforcement of oral contracts for the conveyance of real property, the Board granted judgment to the Department. Discerning no error, we affirm.

This case arises from Firetree's 2004 effort to purchase the Laurelton Center, located in Union County, from the Commonwealth. On April 6, 2005, Firetree filed an original jurisdiction action with this Court to compel the Department to convey Laurelton Center to Firetree and to restrain the Department from transferring the Laurelton Center property to anyone else. *Firetree, Ltd. v. Department of General Services* (Pa.Cmwlth., No. 165 M.D.2005, filed November 3, 2005). This Court transferred Firetree's contract claim to the Board, which the Board dismissed for the reason that the contracts in question had never been executed by the Secretary of General Services. This Court affirmed. *Firetree, Ltd. v. Department of General Services,* 920 A.2d 906 (Pa. Cmwlth.2007).

Prior to filing its 2005 original jurisdiction action with this Court, Firetree undertook to settle the Laurelton Center matter, as well as a dispute that its affiliate, New Foundations, Inc., had regarding the Commonwealth's alleged promise to sell it property on Arch Street in Philadelphia. On April 6, 2005, Governor Edward G. Rendell and representatives of the Department met with Allen Ertel and representatives of Firetree and New Foundations. First Amended Statement of Claim, ¶ 60 (Claim, ——). Firetree contends that the meeting resulted in a settlement that contained all the material terms needed to effect a valid and binding contract among the Department, Firetree and New Foundations. In essence, the so-called "April Settlement Agreement" required the Department to convey Laurelton Center to Firetree and the Arch Street property to New Foundations. Claim, ¶ 84.[1] The terms of this settlement were not reduced to writing.

When the closing on the April Settlement Agreement did not occur, Firetree initiated its April 2005 action against the Department. However, the parties undertook new settlement discussions in August of 2005. Claim, ¶ 105. Firetree contends that in this second round of discussions, the Secretary of General Services, James Creedon, and Ertel settled the April 2005 litigation. Claim, ¶ 107. In essence, this second settlement, the so-called "Creedon Settlement Agreement," required the Department: to convey the Arch Street property to New Foundations; to lease the Arch Street property from New Foundations; and to lease Danville State Hospital to Firetree. Claim, ¶ 108.[2] Again, howev-

1. The relevant terms of the alleged April Settlement Agreement are:
 a. The closing on New Foundation's purchase of Arch Street would be continued until July 1, 2005.
 b. New Foundations would receive a credit of approximately $1.5 million against the purchase price for Arch Street. The credit would be equal to the amount of offset the Commonwealth had previously agreed to reimburse Firetree for Firetree's reconstruction of certain buildings at the Wernersville State Hospital in Berks County.
 c. The Agreement of Sale for Arch Street would be amended in order to allow New Foundations to assign it to a third party.
 d. [The Department] would honor its contract to sell the Laurelton Center to Firetree.
 e. Governor Rendell would help Firetree get the zoning approval necessary for Firetree to expand its Lycoming House facility in the Point Breeze section of Philadelphia. This expansion was crucial to Firetree's efforts to develop a larger facility within the City of Philadelphia.
 f. New Foundations would transfer Arch Street to a developer.
 Claim, ¶ 84.

2. The relevant terms of the alleged Creedon Settlement Agreement are:
 a. [The Department] would transfer Arch Street to New Foundations.
 b. New Foundations would subsequently transfer Arch Street to a developer who would change its use from a drug and alcohol treatment center and halfway house.
 c. New Foundations would lease Arch Street back to [the Department] for $68,000.00 per month, with all expenses paid by [the Department]
 d. The lease to [the Department] would expire on April 30, 2006.
 e. The lease amount would be paid in advance as a credit against the purchase price.
 f. During the term of this lease, [the Department] would allow reasonable access to New Foundations or its assignees.
 g. [The Department] would provide New Foundations with a credit against the purchase price for Arch Street in an amount equal to the amount of the set-off owed by [the Department] to Firetree, as of July 5, 2005, for reconstruction costs at the Wernersville State Hospital.
 h. [The Department] would amend Firetree's lease for property at the Wernersville State Hospital as follows: the new lease amount would be $1.00 per year; the new lease term would commence on or about the date of the execution of a written settlement

er, the Department did not execute a written agreement.[3] Claim, ¶ 113.

On March 5, 2006, Firetree filed the present claim with the Board, seeking to recover its lost profits, lost rental income and increased operating expenses caused by the Department's breach of both the April Settlement Agreement and the Creedon Settlement Agreement.[4] The Depart-

agreement; Firetree would not be entitled to a set-off against rent for repair costs already incurred; Firetree would pay utility costs for space actually utilized, minus the costs of the utilities paid by Firetree (which is the cost of gas for Wernersville Building 30). Otherwise, all of the terms in the existing lease would remain the same.

i. [The Department] would lease to Firetree Building 6 at Danville State Hospital and Temple 1 and 2 at Mayview State Hospital. The terms of these leases would be the same as the Wernersville lease, as modified herein.

j. Mayview would not have any recapture provisions but would be leased to Firetree for $1.00 per year.

k. New Foundations and Firetree would withdraw their actions against [the Department].

l. The remaining term to be resolved was a lease of the EPPI site in Philadelphia. This was subsequently agreed upon and the agreement was completed.

Claim, ¶ 108.

3. On July 22, 2005, Firetree filed another claim with the Board at Docket No. 3779, alleging that the Department breached its contract and duty to convey Laurelton Center to Firetree and seeking damages of $2,830,000; the Board stayed Firetree's claim pending a ruling from this Court in the equity action, No. 165 M.D.2005. On August 8, 2005, New Foundations also filed a petition for review in our original jurisdiction seeking to compel the Department to proceed to settlement and closing on the Arch Street property in Philadelphia; this Court held that the Board of Claims had exclusive jurisdiction over its claim. *New Foundations, Inc. v. Department of General Services*, 893 A.2d 826 (Pa.Cmwlth.2005).

4. The First Amended Statement of Claim states the following with respect to Firetree's alleged damages:

116. Firetree has suffered damages as a result of [the Department's] breach of the Arch Street Agreement, the April Settlement Agreement, and the Creedon Settlement Agreement.

117. These damages include but are not limited to increased operating expenses and decreased or limited revenue.

118. New Foundations had contracted to sell Arch Street for $8 million, which would have resulted in a net gain of $1.5 million.

119. Under the Creedon Settlement, New Foundations or its assignee was to lease Arch Street back to [the Department] for $68,000 per month over the period of 10 months, for a total loss of rental income in the amount of $680,000.

120. During the term of this lease, New Foundations or its assignee was to have reasonable access to Arch Street. This access could be leased to the ultimate purchaser for an amount of $30,000 per month for a total of $300,000.

121. The Governor's assistance in obtaining zoning at Lycoming House is worth at least $120,000.

122. According to the Commonwealth, Laurelton Center has a fair market value of at least $1,750,000, resulting in a net loss of at least $867,000.

123. Laurelton Center would have earned annual net revenue of approximately $12.5 million after the facility was operating at projected numbers.

124. The loss on the Wernersville reimbursement was approximately $1,500,000 plus interest.

125. A lease of $1.00 per year at Wernersville would have resulted in a net rental savings of approximately $6,480,000 over the term of the lease.

126. A lease of $1.00 per year at Danville would have resulted in a net rental savings of approximately $1,779,375 over the term of the lease.

127. A facility at Danville would have provided a net income of $6,137,000 over the term of the lease.

128. A lease of $1.00 per year at Mayview would have resulted in a net rental savings of approximately $2,669,000 over the term of the lease.

129. A facility at Mayview would have provided a net income of $9,198,000 over the term of the lease.

ment filed an answer with the Board, denying that a settlement had been reached on April 6, 2005, or at any point thereafter. Department Answer, ¶¶ 80, 84, 108, 109. In new matter, the Department asserted several affirmative defenses to Firetree's claims including, *inter alia*, the Statute of Frauds and sovereign immunity.

Thereafter, the Department filed a motion for summary judgment asserting that: (1) the Board lacked jurisdiction to hear disputes arising from oral agreements; (2) the alleged settlement agreements, which purported to convey fee simple and leasehold interests in real estate, were unenforceable because they had not been reduced to writing as required by the Statute of Frauds; and (3) the parties had never reached a meeting of the minds on the essential terms of a settlement.

Firetree did not respond to the merits of the Department's motion for summary judgment. Instead, it opposed the Department's motion on the basis that additional discovery was needed to determine whether the parties had reached a meeting of the minds in April and later in August of 2005. The Rules of Civil Procedure provide in relevant part that:

An adverse party may supplement the record or set forth the reasons why the party cannot present evidence essential to justify opposition to the motion and any action proposed to be taken by the party to present such evidence.

PA. R.C.P. No. 1035.3(b). Firetree argued that it needed more discovery, which precluded a grant of summary judgment.

Because it was undisputed that there were no agreements reduced to writing, the Board concluded that discovery was unnecessary, at least with respect to the Statute of Frauds basis for the Department's summary judgment motion. Firetree's Statement of Claim was founded upon the Department's agreements to sell or lease real property to Firetree and New Foundations and the Department's unrebutted evidence confirmed that these agreements had not been reduced to writing. Accordingly, the Board concluded that there were no material facts in dispute on the question of whether Firetree's claims were barred by the Statute of Frauds. Indeed, the Board went further, concluding that it lacked jurisdiction to enforce any oral settlement agreement, regardless of its subject matter. In accordance with these conclusions, the Board dismissed Firetree's claim with prejudice, and the present appeal followed.

On appeal,[5] Firetree presents three issues for our consideration. First, Firetree

130. A facility at EPPI would have provided a net income of $22,995,000 over the term of the lease.
131. New Foundations is losing interest income of approximately $34,500 per year as a result of [the Department] holding the $575,000 deposit for Arch Street.
Claim, ¶¶ 116–131.

5. The standards which govern summary judgment are well settled. When a party seeks summary judgment, a court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. *Fine v. Checcio*, 582 Pa. 253, 265, 870 A.2d 850, 857

(2005). A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. *Id.* In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Id.* Finally, the court may grant summary judgment only when the right to such a judgment is clear and free from doubt. *Id.* An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion. *Id.* at 265 n. 3, 870 A.2d at 857 n. 3. Whether the Board has jurisdiction over the claims of Fire-

argues that the Board erred in entering summary judgment before the close of discovery. Second, it contends that an oral agreement to convey and lease real property can be enforced, notwithstanding the Statute of Frauds. Third, it contends that the Board has jurisdiction to enforce an oral settlement agreement.[6]

 On the first issue, we conclude that the Board was correct that it could reach a decision on the merits of the Department's motion for summary judgment even though Firetree sought more discovery. This is because with respect to the Statute of Frauds issue decided by the Board, the only relevant factual issue was whether the agreements were written.[7] Firetree's witness admitted in his deposition that "[t]here were no written agreements." Firetree's Answer to Motion for Summary Judgment, Exhibit D, at 246.

The Rules of Civil Procedure apply to matters before the Board of Claims, and they provide that the adverse party must respond to a motion for summary judgment within 30 days. PA. R.C.P. No. 1035.3.[8] The response may not rest solely on allegations in the pleading but must produce evidence contravening evidence cited by the moving party. Firetree sought to avoid the 30–day response obligation by asserting it needed to continue discovery in order to determine "whether the parties came to a meeting of the minds on either or both agreements." Firetree's Answer to Motion for Summary Judgment, ¶ 5. Its effort in this regard, however, is unavailing.

The Department's Statute of Frauds defense was able to be decided on Firetree's allegations in its pleadings and on Firetree's admission that the agreements were not written. This is true also with respect to Firetree's second argument, *i.e.*, that notwithstanding the Statute of Frauds, an action for damages can proceed when there is a breach of an oral agreement that creates an interest in real estate. Therefore, the Board did not err in considering the merits of the Department's motion, notwithstanding Firetree's request for more discovery.

 We turn, then to the merits of the Board's decision, *i.e.*, that the Statute of

---

tree is a question of law; accordingly, our standard of review is *de novo*. *Id*. Our scope of review, to the extent necessary to resolve the legal question before us, is plenary. *Swords v. Harleysville Insurance Companies*, 584 Pa. 382, 390, 883 A.2d 562, 567 (2005).

6. In *Department of Health v. Data–Quest, Inc.*, 972 A.2d 74 (Pa.Cmwlth.2009), this Court held that the Board of Claims does have jurisdiction to consider quasi-contract claims not based upon a written contract. We do not address Firetree's third issue because it is not necessary in light of our disposition of Firetree's other issues.

7. Rule 1035.2 of the Rules of Civil Procedure provides that after the relevant pleadings are closed, any party may move for summary judgment

whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense . . .

PA R.C.P. 1035.2(1).

8. It states:

Except as provided in subdivision (e), the adverse party may not rest upon the mere allegations or denials of the pleadings but must file a response within thirty days after service of the motion identifying

(1) one or more issues of fact arising from evidence in the record controverting the evidence cited in support of the motion or from a challenge to the credibility of one or more witnesses testifying in support of the motion, or

(2) evidence in the record establishing the facts essential to the cause of action or defense which the motion cites as not having been produced.

PA. R.C.P. No. 1035.3.

Frauds barred Firetree's action. The Statute of Frauds states as follows:

From and after April 10, 1772, *all leases, estates, interests of freehold or term of years,* or any uncertain interest of, in, or out of any messuages, manors, lands, tenements or hereditaments, made or created by livery and seisin only, or by parol, *and not put in writing, and signed by the parties so making or creating the same,* or their agents, thereunto lawfully authorized by writing, *shall have the force and effect of leases or estates at will only,* and shall not, either in law or equity, be deemed or taken to have any other or greater force or effect, any consideration for making any such parol leases or estates, or any former law or usage to the contrary notwithstanding; except, nevertheless, all leases not exceeding the term of three years from the making thereof; and moreover, that no leases, estates or interests, either of freehold or terms of years, or any uncertain interest, of, in, to or out of any messuages, manors, lands, tenements or hereditaments, shall, at any time after the said April 10, 1772, be assigned, granted or surrendered, unless it be by deed or note, in writing, signed by the party so assigning, granting or surrendering the same, or their agents, thereto lawfully authorized by writing, or by act and operation of law.

The Act of March 21, 1772, 1 Sm.L. 389, 33 P.S. 1 (emphasis added). In short, unless a contract for the lease of property for a term longer than three years or for the conveyance of a fee simple or other estate of land is written, it cannot be enforced. At best, the party with an oral agreement will establish a tenancy at will. The object of the Statute of Frauds

is to prevent the assertion of verbal understandings in the creation of inter-

ests or estates in land and to obviate the opportunity for fraud and perjury. It is not a mere rule of evidence, but a declaration of public policy.

*Kurland v. Stolker,* 516 Pa. 587, 592, 533 A.2d 1370, 1372 (1987).

Firetree contends, however, that there are "exceptions" to the Statute of Frauds. In support, it directs the Court's attention to two cases: *Nakles v. Union Real Estate Company of Pittsburgh,* 415 Pa. 407, 204 A.2d 50 (1964) and *Jahanshahi v. Centura Development Co., Inc.,* 816 A.2d 1179 (Pa.Super.2003). We discuss only *Nakles* because in *Jahanshahi,* the Superior Court simply applied the *Nakles* holding to a nearly identical set of facts.

In *Nakles,* tenants brought a breach of contract action against their landlord with respect to their agreement to lease a commercial property for the tenants' restaurant business. The tenants' evidence established that the parties had agreed upon the terms of the lease; the tenants had paid one month's rent; and the landlord had prepared a lease that the tenants had signed and returned. *Nakles,* 415 Pa. at 409, 204 A.2d at 51. The landlord, who had not signed the lease, claimed that there was no lease and, therefore, he was free to rent the property to another tenant at a higher rent. The Supreme Court held that given these circumstances, the tenants proved the existence of a tenancy at will, which is the maximum real property interest that can be conveyed orally under the Statute of Frauds. Stated otherwise, the tenants were not entitled to enforce the terms of their lease. The tenants were also able to pursue damages, but those damages were limited to recovery of their out-of-pocket expenses. To allow the tenants their claim for lost profits would have effectively given the tenants specific performance of their unexecuted lease, which would have violated the Statute of Frauds.

*Nakles* does not support Firetree's position that the April and Creedon Settlement Agreements did not need to be in writing in order for Firetree to pursue its action for contractual damages. First, Firetree's claims are factually distinguishable because Firetree has not produced a written agreement that was drafted by the Department and signed by Firetree. Second, the tenants in *Nakles* achieved only a tenancy at will, but they were denied specific performance of their putative lease for a period of years. Third, the tenants in *Nakles* were unsuccessful in their efforts to obtain damages in the form of lost profits, which are the damages sought by Firetree. *Nakles* is not an exception to the Statute of Frauds, as asserted by Firetree. *Nakles* simply explains how the application of the Statute of Frauds applies to a situation where a tenant has signed a lease and made partial payment on the lease but has failed to obtain the landlord's signature on the lease.

In rare instances, a plaintiff can enforce an agreement to convey real property on the strength only of an oral agreement. These include, for example, cases where the seller admits that there was an oral agreement for the sale of the property or has waived the Statute of Frauds defense. *See, e.g., Zlotziver v. Zlotziver,* 355 Pa. 299, 302, 49 A.2d 779, 781 (1946) (holding that where the seller admits, either in pleadings or testimony, the existence of the contract, the purpose of the Statute of Frauds is served and the oral agreement will be enforced). Land may also change hands where there is proof that the buyer paid consideration for the land; that the buyer took possession of the land; that the

buyer's harm could not be compensated in damages; and that a rescission would be manifestly unfair.

In *Greenwich Coal & Coke Company v. Learn,* 234 Pa. 180, 83 A. 74 (1912), for example, a coal company claimed title to certain mineral rights under a deed given to it by Peter Learn. The son of Peter Learn, Elias, claimed title to the land, which he had received by oral gift from his father. Numerous witnesses confirmed that Peter had declared that the land had been conveyed to Elias and that this gift to Elias was similar to those made by Peter to his other sons. There was no question about the boundaries of the land given to Elias because it had been surveyed prior to the conveyance. After taking possession of the land, Elias made valuable improvements to the land; built a house thereon; lived there over 20 years; and paid the real property taxes on the land, consistent with the directions of Peter to the taxing authorities. In sum, the property was widely known as belonging to Elias. Peter did not deny these facts but claimed that he had not conveyed the mineral rights to his son because he did not know that there was coal under the property's surface.[9] Because there had been no severance of title to the coal prior to the gift, the Supreme Court concluded that ownership of the surface rights "carried with it the actual possession downward perpendicularly through the various strata." *Id.* at 187, 83 A. at 76. A jury found in favor of the son, and the Supreme Court found no error.

The cases upholding a change in property ownership by oral agreement have fad-

---

9. *Greenwich Coal* analyzes the issue in terms of whether the actions of the parties took the transfer of land from Peter Learn to Elias Learn out of the Statute of Frauds. However, because Peter did not deny the existence of his oral gift of land, the outcome can also be understood as Peter's waiver of the Statute of Frauds defense. The real problem with Greenwich Coal's deed was that Peter Learn had not separated the mineral rights from the surface land, either orally or in writing.

ed with time. *See Kurland,* 516 Pa. at 592–593, 533 A.2d at 1373 (listing cases where transfers of land outside the Statute of Frauds have been allowed as well as cases where oral transfers were disallowed). As explained by our Supreme Court in *Kurland,* cases such as *Greenwich Coal* are exceptional.

In *Kurland,* the plaintiff, Allan Cohen, sought specific performance of an oral contract for the purchase of a residence from Leonard Stolker. Cohen died before trial, but his action was continued by his executor, Edward Kurland. Kurland's evidence at trial consisted of Cohen's deposition testimony and the testimony of Mrs. Cohen, Allan's widow. The Cohen estate's story was that the Cohens had lived in three different residences in Stolker's development and that Stolker had agreed to sell the last one to Cohen for $37,500 in cash, with the remainder to be paid by Cohen's labor for Stolker. Cohen testified that he had made a payment of $10,000 towards the purchase, but his estate could not produce a cancelled check or a receipt at trial. Stolker testified to another story. He stated that Cohen worked for him in security and maintenance at the rate of $100 per week, which was credited towards Cohen's rent obligation. In support, Stolker produced a rental log; W–2 forms given to Cohen; and his receipts for water, sewer and tax payments Stolker made on the property allegedly sold to Cohen.

■ The Supreme Court reversed the trial court's grant of judgment to Kurland on behalf of Cohen's estate. It explained that the burden of proof where a plaintiff asserts the existence of an oral agreement to convey land is very high. Specifically, the "terms of the contract must be shown by full, complete, and satisfactory proof," and the plaintiff must provide evidence "of such weight and directness as to make out the facts alleged *beyond a doubt.*" *Id.* at

592–593, 533 A.2d at 1373 (emphasis in original). The Supreme Court found the plaintiff's evidence, consisting of testimony, much of which was hearsay, was wholly inadequate to rebut Stolker's evidence that he had, *inter alia,* paid the taxes, water and sewage fees on the property allegedly transferred to Cohen.

Our Supreme Court explained the reason for the high burden of proof:

> The [S]tatute [of Frauds] is simple and intelligible. Every mind is capable of understanding that contracts about land, if more is meant than a three year lease, must be in writing … And what rule is more reasonable? Land is the most important and valuable kind of property.

*Id.* at 591–592, 533 A.2d at 1372. Accordingly, where a plaintiff seeks "to take an oral contract for real estate out of the statute," the plaintiff's evidence must be "complete" and satisfy numerous elements. *Id.* at 592, 533 A.2d at 1373. Those elements have been enumerated as follows:

> *The terms of the contract must be shown by full, complete, and satisfactory proof.* The evidence must define the boundaries and indicate the quantity of the land. *It must fix the amount of the consideration.* It must establish the *fact that possession was taken in pursuance of the contract,* and, at or immediately after the time it was made, the fact that the *change of possession was notorious, and the fact that it has been exclusive, continuous and maintained.* And it must show performance or part performance by the vendee which could not be compensated in damages, and such as would make rescission inequitable and unjust.

*Id.* at 593, 533 A.2d at 1373 (emphasis added).

■ There is no way to read Firetree's pleading and infer that it can support its

claim to the Laurelton Center or the Arch Street property with the "indubitable proof" required by *Kurland.* Indeed, Firetree's allegations of repeated negotiations are at direct odds with such a claim. At best, Firetree's pleadings show an agreement to agree. Further, Firetree's Statement of Claim does not enumerate all the essential terms identified in *Kurland* as essential to proving a transfer of real property by oral agreement. For example, Firetree's pleading did not identify the fixed consideration; did not assert partial performance by the Commonwealth; and did not assert that either Firetree or New Foundations had taken exclusive and continuous possession of the properties in question for a long period of time.

 The general rule provides that one who holds an oral contract for the conveyance of real estate is not entitled to specific performance. *Polka v. May,* 383 Pa. 80, 84, 118 A.2d 154, 156 (1955). The plaintiff may seek damages, but the measure of those damages is limited to "the money that was paid on account of the purchase and the expenses incurred on the faith of the contract." *Id.* Here, by contrast, Firetree seeks consequential damages in the form of lost rental income and lost profits. Specifically, it seeks damages for its loss of rental income it would have realized; lost profits that it would have realized from the sale of the Arch Street property; and lost profits it would have earned from operating a business on the site of the Laurelton Center. To award these damages to Firetree would be tantamount to giving it the benefit of a contract that is unenforceable under the Statute of Frauds. At best, damages are limited to expenses incurred in reliance on the oral contract. *Rineer v. Collins,* 156 Pa. 342, 352, 27 A. 28, 30 (1893).

Firetree did not produce any evidence, let alone evidence of "such clearness and directness as will leave no doubt" that it had an oral agreement of the type that can be "taken out" of the Statute of Frauds. *Kurland,* 516 Pa. at 594, 533 A.2d at 1373. It needed this evidence even to file a claim that so clearly implicated the Statute of Frauds. Even if Firetree proved an oral agreement, it could not be awarded the type of damages it seeks, *i.e.,* lost profits. The grant of such damages would constitute specific performance, which would violate the Statute of Frauds. *Rineer,* 156 Pa. at 352, 27 A. at 30.

For these reasons, the decision of the Board is affirmed.

### *ORDER*

AND NOW, this 30th day of July, 2009, the order of the Board of Claims in the above-captioned matter, dated May 2, 2008, is AFFIRMED.