J-A08045-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MARY HUSTON | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| ALLEN L. SUMMERHILL AND LORI H. SUMMERHILL | : | |
| Appellees | : | No. 1174 WDA 2013 |

Appeal from the Judgment Entered on September 9, 2013
In the Court of Common Pleas of Armstrong County
Civil Division at No.: 2010-1790-Civil

| | | |
|---|---|---|
| MARY HUSTON | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | : | |
| v. | : | |
| ALLEN L. SUMMERHILL AND LORI H. SUMMERHILL | : | |
| Appellants | : | No. 1183 WDA 2013 |

Appeal from the Judgment Entered on September 9, 2013
In the Court of Common Pleas of Armstrong County
Civil Division at No.: 2010-1790-Civil

BEFORE:  SHOGAN, J., OLSON, J., and WECHT, J.

MEMORANDUM BY WECHT, J.: **FILED OCTOBER 03, 2014**

In this quiet title action, Mary Huston appealed the trial court's entry of judgment and Allen and Lori Summerhill (collectively, "the Summerhills") filed a separate appeal of the same judgment. In the underlying matter, the

trial court rejected the Summerhills' effort to establish that a putative "lease-purchase" agreement granted them title to the farm at issue. Instead, the trial court granted Huston sole possession of the title of the farm. The court found that no documentation existed to satisfy the Statute of Frauds (the "Statute"), which governs such transactions. However, the court awarded the Summerhills damages equal to their improvements to the farmstead, which they made over at least eleven years that they possessed the land. We affirm.

In its dispositive Adjudication and Order, the trial court made the following findings of fact.

1. Mary Huston resides at 230 Huston Road, Ford City, Pennsylvania.

2. The Summerhills reside at 1052 Main Street, Ford City, Pennsylvania.

3. Defendant Lori Summerhill is the daughter of Edward Huston. Defendant Alan Summerhill is Edward Huston's son-in-law.

4. Plaintiff Mary Huston married Edward Huston in October 1998 after a long relationship.

5. At the time of the marriage of Edward Huston and Mary Huston, Edward Huston was the owner of a[n 82-acre] tract of land ["the Property"] situate in Manor Township, Armstrong County, Pennsylvania . . . .

* * * *

6. The Property had been conveyed to Edward Huston by deed recorded on October 25, 1995 . . . . As of that time, the Property was used primarily as a dairy farm.

7. Edward Huston at certain times leased the Property, for dairy farming purposes, for approximately $9,600 per year.

8.    On or about November 12, 1998, Edward Huston conveyed the Property to himself and Mary Huston, as tenants by the entireties, by deed record on November 17, 1998 . . . .

9.    The Deed does not contain any exceptions or reservations regarding a life estate, any oral or written agreements of sale, or any leasehold interests, other than an exception and reservation of the lower Kittanning seam of coal.

10.    Mary Huston continues to reside on the Property.

11.    Edward Huston died on or about June 18, 2005.

12.    Commencing in 1998, the Summerhills began to make cash payments to Edward Huston and/or Mary Huston.

13.    The [forty-four] cash payments were made by checks drawn on a "Farm Account" that were signed by Defendant Alan L. Summerhill[, some of which were endorsed by Edward Huston, others of which were endorsed by Edward and Mary Huston jointly or Mary Huston individually, and the balance of which were not endorsed.]

* * * *

15.    Only some of these checks were endorsed by Ed Huston. His signature on the checks made them available for cashing, and not necessarily to ratify or create any written agreement of sale between himself and [the Summerhills].

16.    The checks made payable to Mary Huston did not create a written agreement of sale between the Summerhills and either Edward Huston or Plaintiff Mary Huston.

17.    Mary Huston maintained, for a period of time, a "ledger" that documented the payments made by the Summerhills to herself and/or Edward Huston.  The payments span a period from 1998 up to and through August 25, 2010.

18.    On September 15, 2010, counsel for the Summerhills sent a letter to Consol Energy Inc. and EXCO Resources (PA), LLC in anticipation of those entities' development of the Marcellus gas resources underlying the Property.  In the letter, counsel advised Consol and EXCO that the Summerhills were equitable owners of the Property and that the developers should take the Summerhills' equitable interests into consideration before proceeding with drilling.

- 3 -

19.    Although Mary Huston had limited correspondence with certain oil and gas companies in the area, she did not establish any present or prospective contractual or business relationships with any of these companies.  Nor were any such prospective or business relationships interfered with in any way by the Summerhills.

20.    The annual fair rental value of the Property during the period from 1997 through 2012 was approximately $800-$1000 per month, or $9,600-$10,000 [*sic*] per year.

21.    Mary Huston has not suffered any economic or other loss as a result of the Summerhills' action in corresponding with gas drilling companies that may have been interested in the Property.

22.    During the term of their leasehold interest, the Summerhills made several improvements to the Property, which included repairs and upgrades to farm buildings, equipment, and the physical integrity of the Property.

23.    Mary Huston had actual or implied knowledge of the repairs that the Summerhills were making to the Property because she was aware of the Property's condition and of the Summerhills' use of the Property as a farm.

24.    The value of improvements made by the Summerhills to the Property during the period of their leasehold interest equals $55,634.51.

25.    The value of the Property was substantially increased due to the improvements made by [the Summerhills].

Trial Court Opinion ("T.C.O."), 12/17/2012, at 1-10 (nomenclature modified for consistency).

The trial court made these findings following a bench trial on the parties' respective claims, which was held on September 19, 2012.  Based upon the above findings, on December 17, 2012, the trial court issued a verdict resolving all of the parties' claims.  Therein, the trial court rendered a verdict in favor of Mary Huston on her claims to quiet title, and awarded

Mary Huston fee simple absolute title to the Property free and clear from any claims that had been or might be asserted by the Summerhills. The court also dismissed Mary Huston's claim for tortious interference with her prospective contractual relations with any gas producer.

In the same order, the trial court dismissed the Summerhills' claims for declaratory judgment and to quiet title, specific performance, and breach of contract. However, the trial court found in favor of the Summerhills on counts V and VI of their complaint, respectively *quantum meruit* and unjust enrichment, and awarded the Summerhills $55,634.51 in damages. Finally the court expressly rejected Mary Huston's statute of limitations and laches affirmative defenses. The parties timely filed post-trial motions. On June 24, 2013, after hearing argument, the trial court denied all post-trial motions.

On July 18, 2013, Mary Huston filed a timely notice of appeal, and, on July 19, 2013, the Summerhills also filed a timely notice of appeal. The trial court then directed the parties to file concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Each party timely complied, and, on July 29, 2013, the trial court entered an opinion pursuant to Rule 1925(a). Therein, the trial court primarily incorporated by reference

the reasoning explicated in its December 17, 2012 adjudication and order. This case now is ripe for our consideration.[1]

At the root of this appeal lie the dueling quiet title actions, which were resolved in Mary Huston's favor. Consequently, we begin by reviewing the issues raised by the Summerhills. The Summerhills' own statement of the questions involved is too prolix to warrant verbatim reproduction. Brief for the Summerhills at 5-6. In their first four issues, the Summerhills raise various challenges to the trial court's ruling that the Statute of Frauds operated to invalidate any purported agreement by Edward and/or Mary Huston to transfer the Property to the Summerhills, subject only to a life estate in either Edward or Mary Huston. In issues five through seven, the Summerhills challenge the trial court's determination that the amounts they remitted to the Hustons on an annual basis reflected a fair rental value for the Property such that the Hustons were not unjustly enriched. We consider these two overarching arguments in turn.

_____

[1] In an August 20, 2013 rule to show cause, this Court raised concerns regarding the purported absence of a final judgment from the record, which is necessary to this Court's jurisdiction over the instant appeals. **See Ryan v. GAF Corp.**, 665 A.2d 843 (Pa. Super. 1995). However, after receiving the parties' responses to the rule, on September 17, 2013, this Court issued an order discharging the rule. The record appears to confirm the entry of judgment. Moreover, in prior cases where it was clear that judgment either was intended to be entered or should have been entered, we have opted to "regard as done that which ought to have been done." **Mackall v. Fleegle**, 801 A.2d 577, 580-81 (Pa. Super. 2002). Consequently, we find that we have jurisdiction and may consider the merits of these appeals, which this Court consolidated *sua sponte* on September 19, 2013.

- 6 -

We begin by reviewing the requirements imposed by the Statute of Frauds and related case law upon the execution of a binding transaction involving the transfer of an interest in land. The trial court provided the following apt review of the applicable standards:

> Because [the Summerhills] assert that a written agreement of sale existed before the execution of the Deed, they must prove the agreement with writings sufficient to satisfy the requirements of the Pennsylvania Statute of Frauds. They also must prove that the purported agreement supersedes the plain language of the Deed.
>
> The Pennsylvania Statute of Frauds, also known as the Pennsylvania Uniform Written Obligations Act, 33 P.S. §§ 1-8, provides as follows with regard to the writings required to effect the sale of a parcel of real property:
>
>> From and after April 10, 1772, all leases, estates, interests of freehold or term of years, or any uncertain interest of, in, or out of any messuages,[2] manors, lands, tenements or hereditaments, made or created by livery and seisin only, or by parol, and not put in writing, and signed by the parties so making or creating the same, . . . shall have the force and effect of leases or estates at will only, and shall not, either in law or equity, be deemed or taken to have any other or greater force or effect . . . .
>
> 33 P.S. § 1. Leases of real property not exceeding three-year terms are excluded from the Statute, but all leases with terms exceeding three years are subject to a separate Statute of Frauds which reads, in pertinent part, as follows:
>
>> Real property, including any personal property thereon, may be leased for a term of more than three years by a landlord to a tenant or by their respective agents [lawfully authorized in writing]. Any such lease must be in writing

_____

[2] A messuage is "[a] dwelling house together with the curtilage, including any outbuildings." Blacks Law Dictionary 1004 (Deluxe 7th ed.).

and signed by the parties making or creating the same, otherwise it shall have the force and effect of a lease at will only and shall not be given any greater force or effect either in law or equity, . . . unless the tenancy has continued for more than one year and the landlord and tenant have recognized its rightful existence by claiming and admitting liability for the rent, in which case the tenancy shall become one from year to year.

68 P.S. § 250.202.

The Pennsylvania Superior Court has concisely summarized the nature, purpose, and practical operation of the Statute Of Frauds as follows:

> The statute of frauds directs that agreements for the sale of real estate shall not be enforced unless they are in writing and signed by the seller. The purpose of the statute is to prevent perjury and fraudulent claims. The Statute of Frauds does not void those oral contracts relating to land which fail to comply with the Statute's formal requirements. It is to be used as a shield and not as a sword, as it was designed to prevent frauds, not to encourage them. Therefore, even though an oral contract for the sale of real estate may not be specifically enforced, it may form the basis for an action to recover damages.[1]

*Empire Props., Inc. v. Equireal, Inc.*, 674 A.2d 297, 302 (Pa. Super. 1996) (internal citations and quotations omitted). "[The Statute of Frauds] is not a mere rule of evidence, but a declaration of public policy. In the absence of equities sufficient of themselves to take the case out of the statute, it operates as a limitation upon judicial authority to afford a remedy unless renounced or waived by the party entitled to claim its protection." *Kurland v. Stolker*, 533 A.2d 1370, 1372 (Pa. 1987) (citing *Haskell v. Heathcote*, 69 A.2d 71 (Pa. 1949)).

_____

[1] "Under the interpretation that has been given to our statute of frauds a recovery of damages may be had for non-performance of a parol agreement for the sale of land, the measure of such damages being the money that was paid on account of the purchase and the expenses incurred on the faith of the contract." *Empire Props., Inc.*, 674

A.2d at 302 (citing **Polka v. May**, 118 A.2d 154 (Pa. 1955))).

A writing sufficient to satisfy the Statute of Frauds must include an adequate description of the property,[2] a recital of the consideration and the signature of the party to be charged.[3] **Hessenthaler v. Farzin**, 564 A.2d 990, 994 (Pa. Super. 1989) (citation omitted). All of the essential terms and conditions of the agreement must be stated in the writing with such certainty so as to disclose an intention of the parties to be bound by the agreement. **Target Sportswear, Inc. v. The Clearfield Found.**, 474 A.2d 1142, 1148 (Pa. Super. 1984) (citations omitted). "A memorandum which omits or incompletely states the essential terms or which merely refers to a contract without stating its terms is insufficient." **Id.**; **see also** Restatement of Contracts § 207 (sufficient writing must be signed by the party to be charged and must state with reasonable certainty the parties to the contract, the land to which the contract relates, and the terms and conditions of all promises constituting the contract). The Pennsylvania Supreme Court has admonished that trial courts "should always be satisfied with [']some note or memorandum['] that is adequate [* * *] to convince the court that there is no serious possibility of consummating fraud by enforcement." **Beeruk Estate**, 241 A.2d 755, 758 (Pa. 1968).

---

[2] An adequate description of the property is "that which would enable a competent surveyor to find the land in question from the agreement or from the references made in it." **Prager v. McAdam**, 161 A.2d 39, 40 (Pa. 1960)[, *abrogated on other grounds by* **Brown v. Hahn**, 213 A.2d 342 (Pa. 1965)]. Parol evidence may be used to show that a written description existing elsewhere applies to the agreement at issue, but may not be used to provide the description itself. **Id.**

[3] The signature of the party to be charged need not be in any particular form. Instead, "the focus has been on whether there is some reliable indication that the person to be charged with performing under the writing intended to authenticate it." **Hessenthaler v. Farzin**, 564 A.2d 990, 993 (Pa. Super. 1989) (citations omitted).

Several writings together can satisfy the Statute of Frauds if the requirements of section 208 of the Restatement of Contracts are met. Section 208 provides as follows:

The memorandum may consist of several writings,

(a) if each writing is signed by the party to be charged and the writings indicate that they relate to the same transaction, or

(b) though one writing only is signed if

i. the signed writing is physically annexed to the other writing by the party to be charged, or

ii. the signed writing refers to the unsigned writing, or

iii. it appears from examination of all the writings that the signed writing was signed with reference to the unsigned writings.

*Target Sportswear*, 474 A.2d at 1147 (citing Restatement, Contracts § 208);[4] *see also Fleming v. Strayer*, 63 A.2d 122, 123 (Pa. Super. 1949) (the inter-relatedness of several writings alleged to satisfy the Statute of Frauds must be self-correlating and cannot be connected by parol or extrinsic evidence.).

_____

[4] Restatement (Second) of Contracts § 132 slightly modifies and liberalizes the standard for using several writings together to satisfy the Statute of Frauds. Section 132 provides that "[t]he memorandum may consist of several writings if one of the writings is signed and the writings in the circumstances clearly indicate that they relate to the same transaction." This section of the Second Restatement has not been adopted in Pennsylvania.[3]

_____

[3] Although our Supreme Court has never adopted section 132, this Court has on at least one occasion cited it as a supplementary source in a case addressing the adequacy of a signature to signify an intent to authenticate a writing. *See Hessenthaler*, 564 A.2d at 993.

T.C.O., 12 17/2012, at 11-15 (citations modified).

Against this backdrop, we consider the Summerhills' first argument, that the trial court had before it sufficient documentary evidence of either or both of the Hustons' intents to be bound to the "lease-purchase" agreement. Brief for the Summerhills at 23-47.[4] The Summerhills cite just one of the dozens of endorsed and unendorsed checks that were introduced at trial as sufficient by itself to establish Mary Huston's intent to be bound. Specifically, they refer to an August 25, 2010 check bearing the memo "3rd Qtr. Lease Purchase 82 Ac. Bal Due $22,800.00," which was "endorsed, negotiated and cashed by [Mary Huston] only after she had apparently carefully reviewed the memo and insisted that the error with regard to the 'balance due' be corrected to reflect '$22,800.00', as opposed to '$12,800.00.'" *Id.* at 29-30. They contend that this check taken alone suffices to establish "that there is no serious possibility of consummating fraud by enforcement." *Id.* at 30; *see Beeruk Estate, supra*. In effect,

_____

[4] There is a great deal to be said for concision in appellate briefing. This portion of the Summerhills' argument is at least twice as long as is necessary fully to articulate its substance, just as the Summerhills' brief in its entirety, which is at best barely compliant with the 14,000-word restriction set forth in Pa.R.A.P. 2135 (and is not compliant inasmuch as it does not contain the mandatory certification by counsel that the brief conforms to the word limit), is longer than many informative, persuasive briefs developing more complicated and numerous appellate issues. Given our crowded docket, this Court appreciates succinct discussions that do not repeat the same premises and conclusions several times over, especially when they contain so few references to on-point legal authority.

the Summerhills would have us rely upon the use of the words "Lease Purchase" to establish the nature of the transaction; the description "82 Ac." to identify the Property (which undisputedly consists of 82 acres); "Bal. Due" to establish "both the consideration remaining to be paid, as well as the total consideration paid for the purchase of said property in the amount of $150,000.00"; and Mary Huston's correction of the balance due and endorsement and cashing of the check without any amendment to the language of the memo line to satisfy the criteria of a memorandum establishing the intention of the parties sufficiently clearly to survive a statute of frauds defense. Brief for the Summerhills at 31.

The Summerhills also note that Mary Huston's maintenance of a "ledger" recording each payment under the agreement as well as a running balance is more consistent with a finite lease-purchase arrangement. Were the relationship just a continuing lease, they suggest, it would be unnecessary to tally all moneys received. They further argue that the above-mentioned check was not the only endorsed check that suggested an ongoing arrangement distinct from a conventional lease:

> [A] minimum of 38 checks were issued from [the Summerhills] to [Edward Huston and/or Mary Huston], as his successor in interest, referencing this transaction, all of which are tied together by virtue of the payments represented by said checks being referenced on said ledger. All such checks were cashed or negoitiated and at least 30 of said checks were in fact signed/endorsed by [Edward Huston] during his lifetime, and/or [Mary Huston] as his successor in interest after his death. Of said 38 checks, 37 of them note the term "Lease Purchase" (or some abbreviation thereof), 26 actually note the word

"Purchase" of which at least 3 or 4 indicate the 'Farm', the '82 Ac Farm' or '82 acres' identifying the property that is the subject of said agreement. The evidence clearly indicates that said "Farm", the "82 Ac Farm" or "82 acres" is the only parcel of real property that [the Hustons] owned, and said acreage is precisely the same acreage noted on [the Hustons'] deeds introduced in evidence.

*Id.* at 33.

The trial court was unpersuaded:

We find that [the Summerhills] have not proved that such an agreement existed. First, although the checks written by [the Summerhills] and cashed by either Edward or Mary Huston contain evidence of a "lease" *or* "purchase" of the 82-acre Property and indicate that $10,000 was due each year, we find that they do not prove the essential terms of an agreement of sale by which both Edward Huston and [the Summerhills] intended to be bound. The documents are equivocal, at best. Moreover, . . . there are no documents of record that indicate any term of the purported agreement that reserved to Edward and Mary Huston a life estate in the residence and immediate c[u]rtilage of the Property. This essential term would have to be implied or assumed by the [trial c]ourt, and that we cannot do. The Deed from Edward Huston [to] himself and Mary Huston is clear, valid, and plainly evidences Edward Huston's intent to transfer fee simple title.

Second, we note that several of the checks on which [the Summerhills] rely are not signed by Edward Huston. Mary Huston's ledger is unsigned and the several checks issued after 2004 were signed and negotiated by Mary Huston only, who is not alleged to have been a party to the purported agreement. Most importantly, no description of the property appears on any of the checks until March 6, 2006, long after Edward Huston's death. Edward Huston cannot, therefore, be deemed to have made or ratified any agreement that would satisfy the Statute of Frauds because there are no documents in the record indicating or even suggesting his assent to such an agreement that includes a description of the [P]roperty, which the Statute of Frauds requires.

- 13 -

> Third, we find that . . . Mary Huston did not intend to "ratify" the purported agreement or any of its terms. Section 208 of the Restatement of Contracts requires that each writing used to satisfy the Statute of Frauds be either signed by the seller or sufficiently connected to the signed writing(s). It has not been alleged that any of the checks endorsed by Mary Huston were "annexed" to or referred to by those signed by Edward Huston. Nor is there any indication that the checks signed by Edward Huston in any way "referenced" the later checks. In short, we reject [the Summerhills'] argument that . . . Mary Huston did or could have "ratified" the purported prior agreement between Edward Huston and [the Summerhills]. No such agreement ever existed, and the related documents in the record at most together indicate that Mary Huston intended to ratify and continue in effect a lease with [the Summerhills].

> Indeed, we find that the documents that [the Summerhills] have proffered prove the existence of, and are entirely consistent with, a lease of the Property for a term of years.

T.C.O., 12/17/2012, at 18-20 (citation omitted).

In reviewing a challenged trial court ruling quieting title, we are bound solely to determine whether the findings of fact are supported by competent evidence, whether an error of law has been committed, and whether there has been a manifest abuse of discretion. *Regions Mortg., Inc., v. Muthler*, 889 A.2d 39, 41 (Pa. 2005) (quoting *Vernon Twp. Vol. Fire Dep't, Inc., v. Connor*, 855 A.2d 873, 879 (Pa. 2004)). We conclude that the trial court's findings of fact are supported by the record, and that the trial court neither erred as a matter of law nor abused its discretion.

First, the trial court properly focused upon the absence of sufficient evidence of any purchase agreement that was executed between the Summerhills and Edward Huston, the sole title holder to the Property at the time the Summerhills insist that the putative agreement commenced. This

- 14 -

is reinforced by the absence of an acknowledgment of any such agreement associated with Edward Huston's transfer of the property to himself and Mary Huston as tenants by the entireties.

Mary Huston's correction to the "balance" at a later date, and the fact that her calculations implied a total sum of payments of $150,000 spanning the life of the agreement, do make this a closer case than the trial court has allowed. But the post-agreement death of Edward Huston, which preceded by years Mary Huston's alleged ratification, seriously undermines this inference. The agreement, of whatever nature, was Edward Huston's at the time of its making, not Mary Huston's, to whom he was not married at the time and who held no interest in the Property.[5] Before Edward Huston's death, the signed writings detailed by the trial court, **see** T.C.O., 12/17/2012, at 3-8 (detailing the checks entered into evidence), consisting solely of negotiated checks, contained no language as specific as that employed in later transactions with Mary Huston, which post-dated Edward Huston's death by years. More specifically, not one of the checks reviewed by the trial court or alluded to by the Summerhills that was tendered during Edward Huston's lifetime specified in any way the size, nature, or metes and

_____

[5]    The record reflects that Edward and Mary Huston did not marry until October 1998. **See** T.C.O. at 2. However, the Summerhills had possession of the property and had begun making improvements as early as October 2, 1997, at least a year earlier. Indeed, in enumerating their damages, the Summerhills note no fewer than five improvements that were completed before the Huston nuptial. **See** Responsive Brief for the Summerhills at 6.

bounds of a specific property.[6] Rather, at their most clear, they specified a particular time span, for example "2nd QTR 02," and the description "Lease Purch," saying nothing to identify or describe the property such that a surveyor could locate it based upon that description alone.

The Summerhills provide no authority suggesting that, even if we accepted at face value their analysis of the import of their later transactions with Mary Huston, it would be appropriate to import that analysis into less specific dealings with Edward Huston at a time nearer to the alleged inception of the agreement, when Edward Huston was the sole title-holder to the Property. While it is true that, under certain narrow circumstances, we

_____

[6] Had those checks contained notations alluding to the eighty-two-acre parcel, especially in the years before Edward Huston deeded the Property jointly to himself and Mary Huston, even just in the abbreviated fashion characteristic of numerous posthumous checks, the adequacy of these memos to satisfy the property description factor would be a closer question. *Compare Sawert v. Lunt*, 62 A.2d 34, 34 (Pa. 1948) (holding, where a receipt of payment cited a street address, that it was sufficient that "all that need[ed] to be done [was] to translate the general designation of the property into a precise description . . . [that] can be readily done under the facts of this case"), and *Cohen v. Jones*, 118 A. 362 (Pa. 1922) (citing *Shaw v. Cornman*, 114 A. 632 (Pa. 1921)) (noting that "the statute of frauds requires land conveyed to be described with such certainty and definiteness as to avoid the necessity of resorting to parol proof to determine the property the parties intended should be transferred," and finding sufficient a description that located the property on a certain road with certain characteristics but did not specify a full street address, when viewed in tandem with the owner's admission that she owned "but one piece of land in the particular locality"), *with Prager v. McAdam*, 161 A.2d 39 (Pa. 1960) (holding that even an otherwise adequate description of the land was insufficient to identify the parcel to be sold where the seller reserved two acres of the sixty-three acres to herself, but did not specify which two acres).

have deemed it appropriate to infer the property implicated by an insufficient description, when admissible evidence leaves no practical doubt as to the land in question, *see* supra n.7, we find insufficient evidence to do so as of November 1998, when Edward Huston deeded the property jointly to himself and Mary Huston, or as of Edward Huston's death in 2005. This is fatal to the Summerhills' argument, because it is the period preceding Edward Huston's death that is most critical to our inquiry into the existence of the lease-purchase agreement alleged by the Summerhills; Mary Huston could not ratify a contract that does not exist. Thus, the trial court did not err or abuse its discretion in rejecting the Summerhills' contention that the evidence of record satisfied the Statute in this case.

The Summerhills next challenge the trial court's rulings declining to apply certain recognized exceptions to the Statute. The Summerhills argue that, if we share the trial court's view that the above-discussed writings did not satisfy the terms of the Statute, we must still rule in their favor on the basis of the "partial performance" or "admission" exception to the Statute. Brief for the Summerhills at 47-55. We address these in turn.

The partial performance exception applies under narrow circumstances "to take an oral contract for real estate out of the [S]tatute." **Kurland v. Stolker**, 533 A.2d 1370, 1373 (Pa. 1987):

> Our case law is very explicit as to the requirements [that] must be met to take an oral contract for real estate out of the statute. The terms of the contract must be shown by full, complete, and satisfactory proof. The evidence must define the boundaries and indicate the quantity of the land. It must fix the amount of

consideration. It must establish the fact that possession was taken in pursuance of the contract, and, at or immediately after the time it was made, the fact that the change of possession was notorious, and the fact that it has been exclusive, continuous and maintained. And it must show performance or part performance by the vendee which could not be compensated in damages, and such as would make rescission inequitable and unjust.

* * * *

The "indubitable proof" a claimant is required to proffer is evidence that should not only be found credible, but of such weight and directness as to make out the facts alleged *beyond a doubt*. . . . [I]t may be proven by the acts and declarations of the parties, either together or separately. The acts and declarations relied upon[] must not, however, be of an equivocal character; they must have such clearness and directness as will leave no doubt as to their meaning and purpose.

*Id.* (emphasis in original).

The Summerhills assert uncontroversially that they satisfy the possessory and notorious factors. They next point to the various payments recited in support of their argument under the Statute, noting that, as of August 25, 2010, their payments to-date totaled $127,200, leaving a "balance" of $22,800, as allegedly confirmed by Mary Huston; the round sum of $150,000, they assert, reflected the terms of the putative purchase component of their lease purchase agreement with Edward Huston. The Summerhills contend that their payments "are obviously substantial . . . and far exceed the fair rental value of the farm property." Brief for the Summerhills at 49. The Summerhills hasten to express their satisfaction with the trial court's award in compensation of their tangible improvements to the property, but contend that those damages fail to compensate

intangible costs such as labor, and further argue that "the actual benefit to the [P]roperty well exceeds said award and is not readily capable of being calculated or remedied with a damage award." *Id.* at 50. They note that many of their undisputed improvements will improve the farm's condition and profitability long after the lease expires. *Id.* at 50-51.

The trial court rejected this argument, as well. The court emphasized that "[t]aking an agreement to transfer real property out of the Statute of Frauds is difficult, and the cases permitting it have dwindled over time." T.C.O., 12/17/2012, at 22 (citing *Firetree, Ltd. v. Dep't of Gen. Servs.*, 978 A.2d 1067, 1074-75 (Pa. Cmwlth. 2009)). The trial court noted that, in *Kurland*, our Supreme Court held that merely "[r]epairing and improving a dwelling house or outbuildings are such improvements as any tenant for a term of years might make, but are not of a character to take a cause out of the statute." *Id.* at 23 (quoting *Kurland*, 533 A.2d at 1375). Furthermore, if such improvements are calculable and may be remedied with an award of damages, a court should not grant specific performance. *Id.* (citing *Klingensmith v. Klingensmith*, 100 A.2d 76, 79-80 (Pa. 1953)).

Applying this standard in the instant case, the trial court observed that the improvements to the land made by the Summerhills were, in fact, readily quantified, and fairly compensated by the court's award of considerable damages corresponding directly to the amount of damages proved at trial by the Summerhills. *Id.* at 28-29; *see also* Rule 1925(a) Memorandum, 8/29/2013 ("Rule 1925(a) Memo."), at 4 (unnumbered) ("The

[trial court's] award of damages was based exclusively on [the Summerhills'] unjust enrichment/*quantum meruit* theory, and the [trial court] utilized the measure of damages suggested by [the Summerhills], which the [c]ourt finds to have been accurate and reasonable in the circumstances."). Moreover, because the court found that $10,000 per year rent was market-appropriate for the Property, the Summerhills could not maintain that their payments in that regard were not calculable, or even constituted a basis for damages in the first instance, the payments being consistent with and appropriate to the lease for a term of years.

Because we find that the trial court's observations regarding the uncertainty of the descriptions of the Property are supported by the evidence, the Summerhills' reliance on the partial performance exception to the Statute must fail: To invoke the exception successfully, the available evidence must describe the property in question with "such clearness and directness as will leave no doubt as to their meaning and purpose." **Kurland**, 533 A.2d at 1373. For the reasons set forth in connection with our analysis of the Summerhills' argument that the available evidence satisfied the Statute, we also find that the evidence failed to meet such a stringent standard.

The Summerhills' final argument in support of their challenge to the trial court's ruling under the Statute is based upon the "admissions" exception to the Statute. Pursuant thereto, a failure to conform to the Statute may be overlooked when the party against whom the contract would

be enforced has admitted the existence of the contract in its pleadings, during discovery, or at trial. *See Lehner v. Montgomery*, 119 A.2d 626, 628 (Pa. Super. 1956). The Summerhills concede that Mary Huston "was understandably careful not to openly admit the existence of the agreement itself for the sale" of the Property, but they maintain "that a careful evaluation of the cumulative evidence in this matter effectively operates to provide an 'admission' as to the essential terms necessary for the formation and existence of said agreement for the sale through a 'lease purchase' of the [Property]." Brief for the Summerhills at 52-53. Their argument in this regard simply reiterates the evidence and inferences highlighted in support of their prior arguments. To the extent their argument recites evidence not mentioned in connection with their previously analyzed issues, the factors submitted fall well outside the bounds of what the trial court or we have the discretion to consider in assessing the fact and nature of the agreement between the parties.

Most importantly, the Summerhills cite no on-point authority for the proposition that an admission may be cobbled together from bits and pieces in the absence of any sign of clear acquiescence to the truth of the proposition that allegedly has been admitted. Rule 2119(a) requires that the party cite in its argument "such . . . citations of authorities as are deemed pertinent." The Summerhills identify nowhere in the pleadings, discovery, or at trial that Mary Huston acceded to the proposition that the agreement in question, if any, reflected a lease-purchase arrangement. However, Rule

2119(c) requires parties before this Court to identify by citation or other reference where in the record this Court might find substantiation of a given claim regarding the evidence in question. We will not scour the record for evidence not clearly identified or located by the party reciting it and it is not our function to advocate for a party who has not set forth a legal basis for the relief sought. *See Estate of Haiko v. McGinley*, 799 A.2d 155, 161 (Pa. Super. 2002); Pa.R.A.P. 2119(c). Accordingly, we must reject the Summerhills' appeal to this exception to the statute of frauds and deny relief.

In their last argument, the Summerhills attempt to rebut the trial court's finding that Edward Huston's transfer of title to the Property jointly to himself and Mary Huston, in a deed that made no reference to the putative lease purchase agreement, indicated that Edward Huston did not intend to enter into a binding lease purchase agreement that Mary Huston could ratify. Brief for the Summerhills at 55-57. Once again, in violation of Rule 2119(a), the Summerhills provide no citations to authority, on-point or otherwise. Instead, the Summerhills recite (again, without citations to the certified record, in violation of Rule 2119(c)) various claims regarding extrinsic factors to argue that the absence of such a notation on the deed did not contradict Edward Huston's intention that the alleged purchase agreement should survive the transfer. Given the lack of supporting legal authority and our uncertainty that we may even consider these factors absent confirmation

that these assertions are substantiated in the certified record, we are constrained to reject this argument.

Having concluded that the trial court did not err or abuse its discretion in rejecting the Summerhills' assertion that the parties had entered into a binding purchase agreement of any nature, we now must review the parties' dueling issues regarding the fairness of the trial court's damage award to the Summerhills. The Summerhills argue that the trial court failed to weigh properly the Summerhills' evidence concerning the fair rental value of the Property. *See* Brief for the Summerhills at 59-60. This evidence included testimony, supplemented by documentary evidence, that the per-acre rental rates paid by the Summerhills for various farm properties in the immediately surrounding area were consistent with an annual rental of approximately $1,300 per year rather than the $10,000 per year that they paid for the Property for the duration of their possession thereof. Additionally, the Summerhills submitted evidence regarding the fair market (purchase) value of farmland statewide, establishing a per-acre price resulting in a valuation of approximately $215,000 for an 82-acre farm property. *See id.* at 62-64. Based upon this, they argue that it is far more likely than not that Edward Huston, and Mary Huston thereafter, intended the agreement to be one that ultimately would lead to transfer of the title to the Summerhills at the conclusion of the alleged contract's term.

The latter argument is readily rejected. The trial court determined that the parties' agreement constituted an annual lease rather than a

purchase contract. Thus, anything couched in terms of a breach of contract that simply seeks to relitigate the parties' intentions in effectuating that agreement requires no review. This analysis applies equally to the Summerhills' later argument that the trial court erred in excluding evidence of comparable farm sales. *See* Brief for the Summerhills at 63-64. Aside from the fact that the trial court indicated that it did consider this evidence, *see* Rule 1925(a) Memo. at 2-4, it is immaterial to the only salient question, which concerns the fairness of the trial court's determination that the rental rate of $10,000 per year was appropriate. Thus this argument, too, warrants no relief.

With respect to the former argument concerning comparable rental rates, we will defer to the trial court's fact-finding, especially given that the Summerhills principally rely upon their own testimony regarding fair rental rates for similar properties in the immediate area. In tension with the Summerhills' argument was the evidence that a tenant who immediately preceded the Summerhills on the Property paid a rental of $9,600 per year for the Property. This finding was supported by the record; indeed it is undisputed. Thus, it was within the trial court's discretion to credit this fact in assessing the market fairness of a $10,000 per year rental over the Summerhills' contrary testimony. It is not this Court's province to invade the trial court's fact-finding. *See generally In re Donna W.*, 472 A.2d 635, 639 (Pa. Super. 1984). Moreover, once again the Summerhills offer no

legal authority in support of their argument, on-point or otherwise. Consequently, we find this argument unavailing.

This brings us to the issues raised by Mary Huston:

I.     Did [the trial court] commit an error of law by applying an exception to the well-established doctrine of accretion that applies only to residential landlord/tenant case law and which is based upon the implied warranty of habitability in this commercial case?

II.     Did [the trial court] commit an error of law by finding that the tenant had established unjust enrichment where there was utterly no evidence that the leased premises had increased in value?

Brief for Mary Huston at 4.

In her first issue, Mary Huston contends that the trial court improperly relied on **Chesney v. Stevens**, 644 A.2d 1240, 1244 (Pa. Super. 1994). Brief for Mary Huston at 7-8. She contends that **Chesney** concerned a residential rather than a commercial lease, and involved unjust enrichment arising from the tenant's improvements to a residential property, where the property did not satisfy the warrant of habitability, and the owner had failed to make due efforts to rectify the situation. She also argues that the long-term lease requirement cited in **Chesney**, **see** infra, was not satisfied in this case, where the trial court found that the parties were engaged in a year-to-year lease.

The trial court relied upon the following analysis:

Generally, under Pennsylvania law, where a lessor makes improvements to the leased premises, the improvements become property of the lessor, who is not under any obligation

to reimburse the lessee for the value of the improvements. *See* 8 Summ. Pa. Jur.3d Property § 26.58 (citing ***DeLeone v. Azad, Inc.***, 52 Pa. D.&C.2d 727 (Phila. Cty. 1971); ***Graham Aviation Co. v. City of Johnstown***, 69 Pa. D. & C. 609 (Cambria Cty. 1950)). However, there are exceptions to this general rule. The Pennsylvania Superior Court has set forth one of the exceptions applicable to this case as follows:

> [I]f a tenant, with a reasonable and good faith expectation of long-term occupancy or ownership, makes substantial and obvious improvements to the real estate of another, the tenant is entitled to compensation for the improvements when they have been accomplished with the actual or implied knowledge and consent of the owner. It is a reasonable corollary of the implied promise to furnish a habitable leasehold rule . . . to imply a promise by the owner to reimburse a tenant for improvements reasonably made when there is a basis for concluding that there has been consent by the owners to the improvements.

***Chesney***, 644 A.2d at 1244. In such cases, where the recovery by the lessee is based on an unjust enrichment or *quantum meruit* theory, the value of damages recoverable by the lessee is the amount of the benefit conferred on the lessor. ***Id.*** at 1244-45; ***see also Styer v. Hugo***, 619 A.2d 347, 350 (Pa. Super. 1993), *aff'd*, 637 A.2d 276 (Pa. 1994) ("The law implies a contract between the parties . . . . This contract requires that the defendant pay the plaintiff the value of the benefits conferred, *i.e.*, that the defendant make restitution to the plaintiff in *quantum meruit*.

Here, [the Summerhills] made significant improvements to the Property [that] undoubtedly increased its value both as a residence and as a working farm. Although [the Summerhills] have not included in the record any evidence of the difference between the value of the Property in 1998 and its current value, we find the evidence of the costs of the improvements to be credible and uncontroverted. Because we find that retention by [Mary Huston] of these benefits without compensating [the Summerhills] for them would be unjust, we will award [the Summerhills] the amount of $55,634.51 in damages . . . .

T.C.O., 12/17/2012, at 27-28 (citations modified).

In reviewing the trial court's ruling, we are guided by the following standard:

Unjust enrichment is essentially an equitable doctrine. Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred. The elements necessary to prove unjust enrichment are:

(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

*Mitchell v. Moore*, 729 A.2d 1200, 1203-04 (Pa. Super. 1999) (citations and internal quotation marks omitted; formatting modified).

Appellate review of equity matters is limited to a determination of whether the [trial court] committed an error of law or abused [its] discretion. The scope of review of a final decree in equity is limited and [the trial court's decision] will not be disturbed unless it is unsupported by the evidence or demonstrably capricious. The test employed is not whether the appellate court would have reached the same result as the trial [court], which heard and saw the evidence, but whether a judicial mind, on due consideration of the evidence, could have reached the conclusion of the trial [court].

*Robbins v. Kristofic*, 643 A.2d 1079, 1082 (Pa. Super. 1994) (quoting *Purdy v. Zaver*, 580 A.2d 1127, 1130-31 (Pa. Super. 1990)).

It is true that *Chesney* concerned a residential lease and involved habitability issues. However, as the Summerhills aptly point out, various

- 27 -

courts have applied **Chesney** for the proposition for which the trial court uses it in the context of commercial leases. Responsive Brief for the Summerhills at 12-14; *see Cambria-Stoltz Enterps., v. TNT Investments*, 747 A.2d 947, 953 (Pa. Super. 2000); *421 Willow Corp. v. Callowhill Assoc.*, No. 1848 MAY.TERM 2001, *et al.*, 2003 WL 21361362, at *7 (Phila. Cty. May 23, 2003); *see also Drysdale v. Woerth*, 153 F.Supp.2d 678, 687-89 (E.D.Pa. 2001). Thus, Mary Huston's argument, which hinges entirely on the proposition that the principles articulated in **Chesney** simply do not apply to commercial leases, is confounded by the cited cases and, in the absence of further argument, warrants no relief.

Mary Huston's second issue is based upon her contention that the trial court's damage award, which was based on a theory of unjust enrichment, was predicated on the flawed conclusion that Mary Huston appreciated any benefits from the improvements to the land made by the Summerhills. Her argument effectively is stated in one sentence: "In other words, there might have been an increase in value, the value of which was not established by the party with the burden of proof, but there is no means by which any increase in value to her is in any means unjust." Brief for Mary Huston at 8-9. Mary Huston does not dispute that the Summerhills presented detailed records of the improvements to the land that they made during their tenancy, which were recited in detail by the trial court. Moreover, she does not cite any authority that might preclude the trial court's reliance upon this to determine that it would be unjust not to compensate the Summerhills for

their improvements. This conclusory attempt to establish trial court error is insufficiently developed to satisfy the requirements of Pa.R.A.P. 2119(a). Consequently, we find that this issue is waived.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/03/2014